**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| KIM A. HERBERT, | ) | CASE NO. 1:17CV1462 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Kim Herbert, ("Plaintiff" or "Herbert"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends the

Commissioner's final decision be AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

# I.  PROCEDURAL HISTORY

In February 2013, Herbert filed applications for POD, DIB, and SSI, alleging a disability onset date of April 2, 2012 and claiming she was disabled due to status post brain aneurysm. (Transcript ("Tr.") 19, 158, 199.)  The applications were denied initially and upon reconsideration, and Herbert requested a hearing before an administrative law judge ("ALJ"). (Tr. 19, 127-133, 136-142.)

On February 11, 2015, an ALJ held a hearing, during which Herbert, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 34-72.)  On March 31, 2015, the ALJ issued a written decision finding Herbert was not disabled.  (Tr. 19-30.)  The ALJ's decision became final on May 18, 2017, when the Appeals Council declined further review.  (Tr. 1-7.)

On July 12, 2017, Herbert filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 16, 17.) Herbert asserts the following assignments of error:

    (1)    In evaluating whether Plaintiff met Listing 12.04 for affective disorder, the ALJ downplayed, if not ignored, the evidence in Plaintiff's medical records and hearing testimony regarding the Part B criteria. With Part A deemed satisfied by the ALJ, Plaintiff needed to satisfy Part B in showing marked restriction in any of the two criteria. However, the ALJ determined that her restrictions and difficulties were "mild" and "moderate" when the evidence in the records and hearing testimony indicates her restrictions and difficulties being much more severe to the level of marked limitation. Thus, there is no substantial evidence to support the ALJ's determination. By finding that Plaintiff's restrictions were less than marked, the ALJ found that Plaintiff did not meet Listing 12.04. When the evidence is properly weighed and found to mean that Plaintiff has marked limitations in three of the Part B criteria, Plaintiff then meets Listing 12.04, making her automatically disabled.

    (2)    The ALJ attacked the credibility of Plaintiff based on her not fully

2

> following treatment recommendations. An ALJ cannot impeach a
> claimant's credibility just because the claimant did not fully follow or
> cooperate with treatment.

(Doc. No. 16.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Herbert was born in June 1966 and was forty-eight (48) years-old at the time of her administrative hearing, making her a "younger" person under social security regulations.  (Tr. 29.)  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c).  She has at least a high school education and is able to communicate in English.  (*Id.*)  She has past relevant work as an light electrical assembler, licensed practice nurse/home health aide, light assembler- supervisor, machine tender-plastics, and quality control supervisor– plastics.  (Tr. 29.)

### B.    Relevant Medical Evidence[2]

On April 15, 2012, Herbert was rushed to the emergency room after she was found on the ground behind her vehicle, unresponsive, confused, and "amnestic to the event."  (Tr. 244, 256.) A CT scan of her head showed a subarachnoid hemorrhage ("SAH").  (Tr. 245, 259.)  The following day, Herbert underwent a "left pterional craniotomy and clipping of an anterior communicating artery aneurysm."  (Tr. 245.)  Herbert's hospital stay was further complicated by blood loss anemia, increased EVD pressure, staph bacteremia, and ventriculitis.  (*Id.*)  Upon discharge, she was advised to attend physical therapy, occupational therapy, and speech language

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

therapy.[3]  (Tr. 238, 245.)

On May 23, 2012, Herbert underwent a follow-up CT scan of her head, which revealed "increasing communicating hydrocephalus . . . with aneurysm clip projecting in the anterior communicating artery region."  (Tr. 292.)  It also indicated Herbert's subarachnoid hemorrhage had resolved.  (*Id*.)

On June 20, 2012, Herbert presented to infectious disease specialist Michelle Hecker, M.D., for follow-up regarding her bacteremia.  (Tr. 238-240.)  She reported no problems with speech or activities of daily living, but did complain of chronic back pain.  (Tr. 238.)  Examination findings were normal.  (*Id*.)  Dr. Hecker found Herbert was "doing very well" but noted she had not yet scheduled her speech, occupational, or physical therapy.  (*Id.*)

That same day, Herbert presented to neurosurgeon Matt Likavec, M.D., for follow up regarding her SAH.  (Tr. 241-243.)  She denied nausea, vomiting, vertigo or tinnitus, and stated her gait was normal.  (Tr. 241.)  Herbert indicated she "still has some trouble with memory but that is improving every day."  (*Id*.)  Dr. Likavec noted the May 23, 2012 CT scan showed resolution of the SAH and no sign of stroke but "still with ventriculomegaly."  (*Id*.)  His impression was that Herbert was "doing well."  (*Id.*)  Dr. Likavec noted he was "still concerned about her ventriculomegaly but with no symptoms I am loathe to jump in and do something."  (*Id*.)  He advised her she could drive short distances, increase her activity and "do a little lifting."

---

[3] During her course of treatment, Herbert was also found to have an enlarging pulsatile mass at her left wrist consistent with an arterial pseudoaneursym.  (Tr. 235.)  She underwent a preoperative Allen's test, which showed evidence of ulnar artery dominance and good palmar artery flow with radial artery decompression.  (*Id*.)  Subsequently, on May 17, 2012, Herbert underwent surgical excision/repair of her left radial artery pseudoaneursym.  (Tr. 284-285, 235.)

4

(*Id.*)

On June 21, 2012, Herbert underwent another CT scan of her head.  (Tr. 289.)  This imaging revealed "moderate communicating hydrocephalus, unchanged from the prior study," as well as "encephalomalacia in the right frontal lobe, unchanged."  (*Id.*)

The following day, Herbert presented to vascular surgeon Jeffrey Alexander, M.D., for follow-up regarding her left wrist pseudoaneurysm.  (Tr. 235-237.)  Herbert reported no complaints and denied any pain, numbness, or coldness of the hand.  (*Id.*)  Examination of Herbert's left hand and wrist was normal.  (*Id.*)  Dr. Alexander noted "no active issues or concerns."  (*Id.*)

On July 9, 2012, Herbert presented to physical medicine and rehabilitation specialist Jill Schleifer-Schneggenburger, M.D.  (Tr. 227-234.)  She complained of memory impairment, stating she "can't remember stuff" and has to write things down as a reminder.  (Tr. 227.)  Her husband felt it was not safe for her to drive and took her car keys away.  (Tr. 227-228.)  Herbert's parents, who were present at the visit, stated Herbert now had a harder time holding a conversation on the telephone, was slow to respond to questions, and often went "off topic."  (Tr. 228.)  Herbert's family also indicated she was not participating in therapy as directed.  (*Id.*)

On examination, Dr. Schleifer-Schneggenburger noted Herbert seemed "impulsive, callous but cooperative with interview."  (*Id.*)  She was alert and oriented, with normal facial symmetry and intact extremity strength.  (Tr. 229.)  Dr. Schleifer-Schneggenburger found Herbert had a stable, nonatalgic gait but walked with her hand on her hip and was distractable.  (*Id.*)  She concluded Herbert "continues with impairments in reasoning, problem solving, memory as well as complaints of generalized back pain and concerns for cognitive and physical

5

function[ing] keeping her from being able to drive safely." (*Id.*)  Dr. Schleifer-Schneggenburger advised Herbert to schedule appointments for physical, occupational and speech/language therapy, and to follow up with Dr. Likavec for any signs and symptoms of hydrocephalus. (*Id.*) She also prescribed Trazodone for Herbert's reported sleep problems. (*Id.*)

The record reflects Herbert presented for an occupational therapy brain injury evaluation on August 16, 2012. (Tr. 306-316.)  The therapist (whose signature is illegible) noted Herbert was cooperative but lethargic. (Tr. 306.)  Herbert complained of aching pain "throughout her body," as well as "a lot of fatigue with" her activities of daily living. (Tr. 307.)  She indicated she did the dishes and dusting and took care of simple meals, but her husband "takes care of the rest." (Tr. 308.)  Herbert also indicated she was not able to shop independently due to fatigue. (*Id.*) With regard to her attention and concentration, the therapist found Herbert was able to attend to a task for five to fifteen minutes in a quiet environment but needed monitoring in a "distractable environment." (Tr. 310.)  She also found Herbert was able to recognize and correct mistakes and accept supervision, but characterized as "fair" her attention to quality of work, speed of performance, adherence to safety, and attention to visual detail. (*Id.*)

In particular, the therapist noted Herbert "began to have decreased attention mildly as [she] worked through test and began answering at a quicker pace causing min[or] errors." (Tr. 311.)  The therapist also noted Herbert was mildly lethargic and mildly distractable with fair eye contact. (Tr. 312.)  With regard to her memory, the therapist indicated Herbert was able to recall three words accurately after 15 minutes. (Tr. 313.)  She was unable, however, to verbally state her daily routine without prompting and assistance. (Tr. 314.)

6

After completing the evaluation, the therapist assessed the following problems: (1) complaints of "decreased overall body strength to safely complete" activities of daily living; (2) decreased memory and problem solving interfering with functional performance; (3) impaired endurance for activities of daily living; (4) disruption of past roles; and (5) architectural barriers and lack of medical equipment for activities of daily living.  (Tr. 316.)  The therapist recommended twice weekly sessions for four to six weeks for strengthening and cognitive retraining.  (*Id*.)

Herbert returned for occupational therapy sessions on August 16 and 20, 2012.  (Tr. 317-318.)  On August 16, 2012, Herbert was able to independently create a shopping list for three meals.  (Tr. 317.)  On August 20, 2012, she complained of neck and shoulder pain, as well as fatigue.  (Tr. 318.)  The therapist noted Herbert "tolerated all tasks but tired easily with exercises."  (*Id*.)  The record reflects Herbert missed her next three scheduled sessions and failed to respond to messages from her therapist.  (Tr. 319-321.)  She was discharged from occupational therapy on August 30, 2012.  (Tr. 321.)

Herbert also presented for speech/language therapy in August 2012.  (Tr. 322-325.)  The therapist (whose signature is also illegible) found Herbert was "within functional limits" in the following categories: (1) orientation; (2) basic problem solving/activities of daily living; (3) auditory comprehension (i.e., pointing to pictures/objects, answering yes/no questions, following directions, and comprehending conversation); (4) visual scanning; (5) comprehending written directions and paragraphs; (6) automatic speech; (7) naming/word retrieval; (8) answering questions; (9) conversational discourse; and (10) speech production.  (Tr. 322-323.)  The therapist found Herbert was impaired in the following categories: (1) attention; (2) complex

7

problem solving; (3) memory; and (4) visual spatial organization.  (*Id.*)  The therapist concluded Herbert "presents with mild cognitive communication impairment characterized by decreased attention, executive functions, short term recall, and visuospatial skills."  (Tr. 323.)  She recommended one to two sessions per week, and characterized Herbert's rehabilitation potential as good.  (*Id.*)

Herbert returned for speech and language therapy on August 20, 2012.  (Tr. 324.)  She reported having good days and bad.  (*Id.*)  Herbert complained of neck and shoulder pain which she rated a 6 on a scale of 10.  (*Id.*) The therapist noted Herbert presented with a flat affect and wearing a "very dirty shirt."  (*Id.*)  The therapist indicated Herbert "may benefit from consult with psychology or counseling."  (*Id.*)  The record reflects Herbert failed to return to speech/language therapy and was discharged on September 11, 2012.  (Tr. 325.)

Herbert also presented for a neurological physical therapy evaluation in August 2012. (Tr. 326-328.)  She complained of "constant pain everywhere," which she rated a 9.5 on a scale of 10.  (Tr. 326-327.)  Herbert also indicated she had loss of interest in her previous activities. (Tr. 328.)  On examination, Herbert was alert and oriented with a good ability to follow commands but "difficulty processing auditory information."  (Tr. 327.)  Her right upper and lower extremity strength was 4+/5 to 5/5, while her left lower and upper extremity strength was 4/5.  (*Id.*)  Range of motion in Herbert's bilateral upper and lower extremities, cervical spine, and trunk was within functional limits.  (*Id.*)  She could walk unlimited distances but the therapist noted "decreased arm swing and trunk rotation as well as decreased right foot clearance with occasional catch."  (Tr. 328.)  Herbert had rounded shoulders and "exaggerated lordosis."  (*Id.*) The therapist recommended one to two sessions per week for four to six weeks.  (Tr. 329.)

8

Herbert returned for physical therapy on August 16, 20, and 23, 2012.  (Tr. 330-331.)  On August 16, 2012, Herbert stated she was "always tired and in pain."  (Tr. 330.)  On August 20, 2012, she complained of increased pain when sitting upright, rating her pain a 6 on a scale of 10.  (*Id*.)  On August 23, 2012, Herbert increased pain and stress.  (Tr. 331.)  The therapist noted Herbert was "poorly motivated" and that she "politely complained with all activities."  (*Id*.)  The record reflects Herbert failed to appear for her next two physical therapy sessions and was discharged on September 20, 2012.  (Tr. 332.)

On February 5, 2013, Herbert presented to Bradley Barker, M.D., for evaluation of her hypertension.  (Tr. 343-346.)  She complained of cough, shortness of breath, urinary frequency/urgency, and body aches.  (Tr. 345.)  On examination, Dr. Barker noted Herbert was alert; oriented to person, place and time; well appearing; and in no distress.  (*Id*.)  Her neurological examination was normal; however, Dr. Barker noted Herbert was depressed and confused with an inappropriate affect.  (*Id*.)  He assessed hypertension, cerebral aneursym, and tinnitus of the right ear.  (*Id*.)  Dr. Barker ordered blood work and prescribed Lozol.  (Tr. 345-346.)

Herbert returned to Dr. Barker on March 5, 2013.  (Tr. 337-342.)  She reported she was not exercising, adhering to a low salt diet, or checking her blood pressure at home.  (Tr. 337.)  Herbert complained of chest pressure and palpitations when having an anxiety attack.  (*Id.*)  She denied claudication, dyspnea, fatigue, irregular heart beat, lower extremity edema, near-syncope, orthopnea, syncope, and tachypnea.  (*Id.*)  Examination findings were normal, including normal mood, behavior, speech, dress, motor activity, and thought processes.  (Tr. 339.)  Dr. Barker advised Herbert to adhere to a low sodium diet and exercise daily.  (*Id.*)  He discontinued her

9

Lozol and prescribed Lotensin.  (Tr. 339-340.)

On September 5, 2013, Herbert began treatment with neurologist Mark Bej, M.D.  (Tr. 380-381.)  She complained of daily headaches, as well as neck, back and arm pain.  (*Id.*)  Herbert was alert and oriented to person, place and time.  (*Id.*)  Examination revealed normal muscle tone and bulk, intact sensation, normal reflexes, and negative Romberg's.  (*Id.*)  Herbert had normal station and gait and performed toe, heel, and tandem walking without difficulty.  (*Id.*)  Dr. Bej found no evidence of scoliosis, lordosis, muscle spasm, or trigger point tenderness on palpation.  (*Id.*)  He assessed (1) migraine without aura, markedly exacerbated into effective status; (2) history of SAH and left temporal surgery; (3) cervical through lumbar myofasciitis; and (4) bilateral medial forearm/hand pain, rule out radiculopathy.  (*Id.*)  Dr. Bej ordered an MRI of Herbert's brain and an EMG of her upper extremities; and prescribed medication.  (*Id.*)

Herbert underwent an EMG of her bilateral upper extremities on September 30, 2013.  (Tr. 378-379.)  It revealed "evidence of a neuropathic, primarily axonal, process affecting the left ulnar nerve at the elbow, most consistent with a compressive lesion in this location."  (*Id.*)  There was no suggestion of cervical radiculopathy.  (*Id.*)

On October 31, 2013, Herbert returned to Dr. Bej.  (Tr. 377.)  She reported continued daily headaches, although she indicated they were less severe.  (*Id.*)  Herbert also complained of sleep problems.  (*Id.*)  Dr. Bej indicated the MRI of Herbert's brain showed "aneurysm clip LICA supraclinoid and mild ventriculomegaly."  (*Id.*)  Physical examination findings were normal, including appearance, mentation, extraocular movements, facial strength or movement, hearing, upper and lower extremity strength and tone, sensation to gross testing, coordination, and gait.  (*Id.*)  Dr. Bej ordered a Polysomnogram and advised Herbert to continue taking her

medication.  (*Id*.)

Herbert underwent the Polysomnogram on November 18, 2013.  (Tr. 376.)  This study supported the clinical diagnosis of moderate positional and mild REM related obstructive sleep apnea, and periodic limb movement disorder.  (*Id*.)  Dr. Bej also noted Herbert's Beck Depression Inventory score was "extremely elevated" and stated "the effect of possible depression on sleep (including perception of one's own sleep) should be considered."  (*Id*.)

Herbert returned to Dr. Bej on December 5, 2013.  (Tr. 375.)  Physical examination findings were again normal.  (*Id*.)  Dr. Bej added diagnoses of obstructive sleep apnea, mostly supine, and possibly neurogenic pain.  (*Id.*)  He advised Herbert to continue her medication and "strongly recommended treating panic attacks."  (*Id*.)

The next medical record cited by the parties is dated January 9, 2015.  (Tr. 382-387.)  On that date, Herbert presented to the emergency room ("ER") with complaints of head, neck, and left shoulder pain.  (Tr. 382.)  She stated that, two days prior, she was babysitting her grandson and suddenly woke up at home "unsure of anything that has happened."  (Tr. 383.)  Treatment records indicate Herbert had "lumps on her head and bruised puffy eyes."  (*Id.*)  On examination, Herbert was awake, alert and oriented with a normal mood and affect.  (Tr. 385.)  She had normal gait and station, normal strength and muscle tone, normal speech, normal sensation, and normal motor function.  (*Id.*)  The ER doctor ordered blood work, as well as CT scans of Herbert's brain, maxillofacial bones, and cervical spine, a chest x-ray, and an EKG.  (Tr. 385-386.)

Herbert's chest x-ray was normal.  (Tr. 422.) The CT of her cervical spine showed mild degenerative disc disease and no sign of acute traumatic injury.  (Tr. 423.)  The Maxillofacial CT showed no acute process other than soft tissue swelling.  (Tr. 424.)  The CT of Herbert's brain

revealed as follows:

> Atrophy is present with compensatory ventricular and subarachnoid space prominence. There is a region of encephalomalacia in the right frontal lobe, compatible with remote infarct. There are postoperative changes of the left frontal craniotomy defect as well as suprasellar aneurysm clip.  There is small dystrophic calcification in the right frontal cortex region.  No acute intracranial bleed.  No midline shift or mass effect.  Gray-white differentiation is maintained.  No extra-axial fluid collection or hydrocephalus.  There is a small scalp hematoma of the right frontal region.  No definite acute fracture. Visualized portions of the paranasal sinuses and mastoid air cells are clear.

(Tr. 425.)

The ER doctor concluded Herbert should be admitted for observation.  (Tr. 387.) Herbert, however, elected to leave against medical advice "stating she had to meet her husband for lunch."  (Tr. 400.)  Her diagnoses on discharge were amnesia, closed head injury, and "left against medical advice."  (Tr. 382.)

**C.      State Agency Reports**

**1.      Mental Impairments**

**A.      Consultative Examinations**

On May 28, 2013, Herbert underwent a psychological consultative examination with Thomas F. Zeck, Ph.D.  (Tr. 362-367.)  She reported suffering two cerebral aneurysms in 2012 and stated "as a result of this she has . . . decreased both long term and short term memory, she has very little if any patience, she has lost interest in her activities, she has a very high anxiety level, she cannot sit or stand for any particular length of time, and she has continuous headaches."  (Tr. 362.)  Herbert also reported diminished strength and stamina.  (*Id.*)  She indicated she is a recovering alcoholic, went to daily AA meetings for a year and a half "at the request of the court," and had her drivers license suspended indefinitely.  (Tr. 363.)  Herbert

12

stated she was in outpatient therapy for anxiety "about twenty years ago."  (*Id*.)

On examination, Dr. Zeck noted Herbert "answered questions directed to her but exhibited a flat affect without any significant animation."  (Tr. 363.)  She had "little emotional expression" and showed a "tendency to be curt at times."  (Tr. 364.)  Herbert's speech was relevant and coherent and Dr. Zeck noted no expressive or receptive language problems.  (*Id*.)  She reported feeling depressed over "everything" with poor sleep and "minimal" energy level.  (*Id*.)  Herbert denied crying spells but reported feeling both hopeless and worthless.  (*Id*.)  Dr. Zeck noted no motor or autonomic signs of anxiety.  (*Id*.)

With regard to Herbert's cognitive functioning, Dr. Zeck found as follows:

She was oriented in all spheres.  She could count backwards from 20 - 1 and do serial 3's as well as serial 7's.  She could recall two out of three items after five minutes and could interpret two of the three proverbs administered to her.  Her concentration, rote memory, and immediate recall were above average based upon her responses to digits forward and backwards.   She was within the average range in her mental arithmetic reasoning abilities and was low average in her abstract thinking and logical thinking abilities.  She knew the current President of the United States as well as the former President.  She could spell world both forwards and backwards.

(*Id.*)  In addition, Dr. Zeck administered the Wechsler Adult Intelligence Scale IV and found Herbert had a full-scale IQ of 95, which placed her within the average range of intelligence classification.  (Tr. 365.)  He noted the results "show no significant weaknesses in her memory" and found "the only area that is low average is in delayed memory where she had difficulty with this throughout the evaluation."  (Tr. 366.)

With regard to Herbert's activities, Dr. Zeck found the following:

She generally can do her [activities of daily living] on a day to day basis and does meal planning and meal preparation.  She needs to take clothes to the laundromat as she does not have a washer or dryer.  She states that she is careful regarding cooking because of her forgetfulness.  She does take and pick up her

husband from work. She can do shopping when necessary. She has lost interest in most of her hobbies. She used to like to draw and do art. She does enjoy reading and football. She does not belong to any clubs nor does she attend church. She has friends but they do not do very much together.

(Tr. 365.)

Dr. Zeck diagnosed depressive disorder, not otherwise specified; and assessed a Global Assessment of Functioning[4] of 60, indicating moderate symptoms. (Tr. 366-367.) In terms of the four broad functional areas, he opined as follows:

**Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions.**

This claimant does have the ability to understand, remember, and carry out instructions. She did exceedingly well on items involving her memory and her comprehension was quite good with no deficits, thus she does have the ability to function in a useful manner to an employer.

**Describe the claimant's abilities and limitations in maintaining attention and concentration and in maintaining persistence and pace to perform simple tasks and to perform multi-step tasks.**

There were no difficulties with her attention and concentration during this evaluation. She worked very diligently, was persistent, and her pace was rather quick. She can perform simple tasks and multi-step tasks. Evidently she cannot go back to her previous job working in factories because she is limited in her strength and she has not yet been released to go back to do physical work. She is considering educational training to find a job that she would be able to do with her disabilities.

---

[4] The GAF scale reports a clinician's assessment of an individual's overall level of functioning. An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. An update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

**Describe the claimant's abilities and limitations in responding appropriately to supervisors and to co-workers in a work setting**.

She states that she was fired once for evidently using alcohol.  She has not indicated any significant problems with supervisors and co-workers, however, she does admit that she can become easily upset and aggravated and this could create problems for her in a work setting with supervisors and co-workers.

**Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.**

She does have the abilities to deal appropriately with the pressures in a work setting.

(Tr. 367.)

On August 22, 2013, Herbert underwent another psychological examination with Dr. Zeck.  (Tr. 369-374.)  She continued to report memory problems as a result of her 2012 aneurysms, noting she forgot her mother's birthday.  (Tr. 369.)  Herbert also complained of constant headaches and pain "throughout her body," and stated "sometimes she does go into a rage."  (*Id.*)  She indicated she becomes confused easily and has "fears of everything."  (*Id.*)  On examination, Dr. Zeck noted Herbert "appeared to be quite sad and depressed as well as resentful."  (Tr. 371.)  She had a flat affect and spoke in a "very soft monotone type of voice." (*Id.*)  Dr. Zeck found Herbert's speech was relevant and coherent; however, Herbert "did not volunteer much information and was rather 'stand off-ish' and only briefly answered questions." (*Id.*)  She reported difficulty sleeping, reduced energy, and feelings of worthlessness.  (*Id.*) Herbert denied crying spells.  (*Id.*)

With regard to her cognitive functioning, Dr. Zeck found Herbert was oriented in all spheres, noting she could count backwards from 20 to 1 and do serial 3's as well as serial 7's. (*Id.*)  He found her "concentration, rote memory, and immediate recall were . . . within the high

15

average to superior range." (*Id.*) Dr. Zeck further concluded Herbert "was within the average

range in her mental arithmetic reasoning abilities and low average in her abstract thinking and

logical thinking abilities." (Tr. 372.)

With regard to her activities of daily living, Dr. Zeck found Herbert can "generally take

care of her own" activities, noting she "does prepare meals and does meal planning," has taken

her clothes to the laundromat, provides transportation for her husband to and from work, and

shops when necessary. (*Id.*) He also noted Herbert does not belong to any clubs or attend

church, and "does have friends but they are not very social." (*Id.*)

Dr. Zeck found Herbert "did not volunteer much information or expand on any of her

answers." (*Id.*) He stated "at times she could be a bit curt and seems to be resentful and hostile

as well as negative and pessimistic." (*Id.*) Dr. Zeck diagnosed major depressive disorder and

alcohol dependence, in remission for one year. (Tr. 373.) He assessed a GAF of 55, indicating

moderate symptoms. (*Id.*)

With regard to the four functional areas, Dr. Zeck found as follows:

**Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions**.

She does have the ability to understand, remember, and carry out instructions. A previous WAIS- IV administered her found her to be within the average range of intelligence functioning. She does have the ability to function in a useful manner to an employer from an intellectual point of view.

**Describe the claimant's abilities and limitations in maintaining attention and concentration and in maintaining persistence and pace to perform simple tasks and to perform multi-step tasks.**

She is able to maintain attention and concentration. She was high average to the superior range in terms of her responses to items involving her concentration, rote memory, and immediate recall. She was able to concentrate and focus during this evaluation.  She feels her limited strength however would create problems for her in

16

carrying out her factory type job which she did have. She states that she would like to work and do more of a sedentary type of job.

**Describe the claimant's abilities and limitations in responding appropriately to supervisors and to co-workers in a work setting**.

She is at times pessimistic and negative and does admit to being easily upset and angered. This will create problems for her in appropriately relating to supervisors and co-workers.

**Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.**

She does have the ability to assess a situation and therefore to be able to respond appropriately to pressures in a work setting, however, she does state that now she gets upset very quickly, judges people and situations instantly, and may become easily angered.

(Tr. 373-374.)

## B. Non-Examiner Opinions

On May 31, 2013, state agency psychologist Karen Steiger, Ph.D., reviewed Herbert's medical records and completed a Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity ("RFC") Assessment. (Tr. 77-78, 81-82.) In the PRT, Dr. Steiger found Herbert was mildly restricted in her activities of daily living; mildly restricted in maintaining concentration, persistence or pace; and moderately restricted in maintaining social functioning. (Tr. 77-78.) In the Mental RFC, she found Herbert did not have any limitations in the categories of understanding and memory, sustained concentration and persistence, or adaptation. (Tr. 81-82.) Dr. Steiger did, however, find Herbert was moderately limited in her ability to interact appropriately with the general public, opining she "should have superficial contact with the general public." (*Id.*)

On August 30, 2013, state agency psychologist Kristen Haskins, Psy.D., reviewed

17

Herbert's medical records and completed a PRT and Mental RFC Assessment.  (Tr. 104-105, 108-109.)  In the PRT, Dr. Haskins found Herbert was mildly restricted in her activities of daily living; moderately restricted in maintaining concentration, persistence or pace; and moderately restricted in maintaining social functioning.  (Tr. 105.)  In the Mental RFC, she found Herbert did not have any limitations in the categories of understanding and memory, and sustained concentration and persistence.  (Tr. 108.)  Dr. Haskins did, however, find Herbert was moderately limited in her abilities to (1) interact appropriately with the general public; (2) accept instructions and respond appropriately to criticism from supervisors; and (3) get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 109.)  She explained as follows:

> [Claimant] should have superficial contact with the general public.  She is able to relate to a few friendly coworkers. [Claimant] reports she is quick to get irritated and angry which could impact ability to respond to criticism and interact with others.

(Tr. 109.)

Dr. Haskins also found Herbert was moderately limited in her ability to respond appropriately to changes in the work setting, noting she "may have an increase in symptoms of depression, with increase in stress and pressure."  (*Id*.)  In conclusion, Dr. Haskins opined Herbert "appears capable of working in a relatively static, low stress environment where contact with others is occasional and superficial in nature."  (*Id*.)

### 2.      Physical Impairments

On June 3, 2013, state agency physician William Bolz, M.D., reviewed Herbert's medical records and completed a Physical RFC Assessment.  (Tr. 79-81.)  Dr. Bolz concluded Herbert could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6

hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday.  (Tr. 79.)  He found

she had an unlimited capacity to push and pull, balance, stoop, kneel, crouch and crawl; but

could never climb ladders, ropes, and scaffolds and only occasionally climb ramps and stairs.

(Tr. 79-80.)  Dr. Bolz opined Herbert had no manipulative, visual, or communicative limitations.

(Tr. 80.)  However, he concluded she should avoid all exposure to hazards, noting Herbert was

"prohibited from commercial driving until cleared by her physician."  (Tr. 80.)  In conclusion,

Dr. Bolz explained as follows:

> While acknowledging and appreciating that [claimant] had a significant
> neurological insult in the form of a [subarachnoid hemorrhage] in 5-2012,
> [claimant's] physical exams have been essentially normal since her DC.  The
> intent of this RFC is to keep her away from potential hazards and prevent spikes
> in her [intracranial pressure].

(Tr. 81.)

On August 6, 2013, state agency physician Gerald Klyop, M.D., reviewed Herbert's

medical records and completed a Physical RFC Assessment.  (Tr. 106-108.)  Dr. Klyop reached

the same conclusions as Dr. Bolz.  (*Id*.)

**D.      Hearing Testimony**

During the February 11, 2015 hearing, Herbert testified to the following:

- She went to college for more than two years.  (Tr. 39.)  She was an EMT and
  then became an LPN.  (*Id*.)  Her LPN license was last valid in 2012.  (Tr. 39-40.)

- In the past, she has worked as a shift supervisor at a plastics making factory,
  where she supervised 25 people.  (Tr. 41-42.)  She also worked in lighting
  assembly.  (Tr. 43-44.)  She has had several jobs over the years as a home
  heathcare aide or LPN in a nursing home.  (Tr. 40-42.)

- She had an aneurysm in 2012.  (Tr. 48.)  Prior to her aneurysm, she was very
  social and happy and had fun.  (*Id*.)  Now, she "can't remember the last time she
  smiled or laughed."  (*Id*.)  She has not worked since the aneurysm.  (Tr. 40.)

19

- She lives in a duplex with her husband.  (Tr. 44-45.)  She can do her hair and get dressed.  (Tr. 46-47.)  She has to be reminded to take showers and brush her teeth.  (Tr. 57.)  She does not do household chores or cleaning because she feels "off balance."  (Tr. 45.)  She will "stand in the middle of the room, look around, and just leave because [she doesn't] know what to do first."  (*Id.*)  She does not cook because she "forget[s] it's on the stove" and burns her food.  (*Id.*)  She does not do laundry because it is too expensive to go to the laundromat.  (*Id.*)  Her husband washes their clothes in the sink or tub, and her husband does all the housework.  (Tr. 46, 57.)  She estimated her husband does 99% of the housework and she does 1% "if that."  (Tr. 57.)

- She can drive but does not do so often.  (Tr. 46.)  She last drove one week before the hearing to go to the corner store.  (*Id.*)  Sometimes she can shop by herself, sometimes she cannot.  (*Id.*)  When she goes to the grocery store, she needs to bring a list.  (Tr. 54.)

- She spends a typical day in her bedroom, watching television.  (Tr. 46.)  She does not come out of her room unless she has to.  (*Id.*)  She avoids going out and visiting others.  (Tr. 47.)  If a friend or neighbor comes over, she will say hello but then go back to her room as soon as possible because she "just doesn't want to be around other people."  (Tr. 48.)  She occasionally goes to the food pantry.  (Tr. 48.)

- She worries about everything.  (Tr. 51.)  She has anxiety attacks during which her chest and throat tighten up and she experiences shortness of breath and heart palpitations.  (Tr. 51-52.)

- She feels fatigued throughout the entire day.  (Tr. 52.)  She feels like "there's a giant hand pushing me down all the time."  (*Id.*)  She lacks energy and motivation and does not sleep well at night.  (Tr. 52-53.)  She does "not feel like a person."  (Tr. 55.)  She feels useless and worthless, like a "waste of space."  (*Id.*)  She goes out of the house as little as possible.  (Tr. 56.)

- She experiences daily, continuous pain from her neck down to her tailbone.  (Tr. 50.)  Her pain level was a 7 out of 10 at the hearing and is usually a 7 or above.  (Tr. 50-51.)  She has no pain free days during a typical month.  (Tr. 51.)  Her medications include Klonopin, Neurontin, Omeprazole, and Wellbutrin.  (Tr. 50.)

- She does not lift heavy objects, and can only stand for 15 to 20 minutes.  (Tr. 49.)  She cannot "deal with" heat, cold, or humidity.  (*Id.*)  She has trouble with balance, and she often drops things.  (Tr. 55.)  She does not have the ability to cope with stress.  (Tr.  49.)  If she were criticized by a supervisor or boss, she would "probably go to the bathroom and hide."  (Tr. 49-50.)  She could not

handle deadlines or the stress of working.  (Tr. 54.)

Herbert's husband also testified at the hearing, as follows:

- He has been married to Plaintiff for 25 years.  (Tr. 59.) They have two grown children.  (*Id*.)  He worked as a millwright prior to his wife's aneurysm.  (Tr. 60.)  He now works as a machine operator at a manufacturing company because that job does not require him to travel.  (Tr. 60-61.)

- Prior to the aneurysm, Plaintiff was happy and they did "everything together." (Tr. 60.)  Now, "she does not want to do anything."  (*Id*.)  She stays in her room 95% of the time because "she feels safe there."  (Tr. 62.)

- She does not do chores because she does not appear to remember how.  (Tr. 61.) He does most of the housework, chores, cooking, and cleaning.  (*Id*.)

The VE testified Herbert had past work as an electrical light assembly worker (light, semi-skilled SVP 3); licensed practical nurse (medium, skilled, SVP 6); machine operator, light assembly worker (light, unskilled, SVP 2); machine tender, plastics (light performed as sedentary, unskilled, SVP 2); and quality control supervisor, plastics (sedentary, semi-skilled, SVP 4).  (Tr. 64-65.)  The ALJ then posed the following hypothetical question:

All right, thank you.  Then if you would consider a person of the claimant's age, education, and past relevant work experience with the capacity for light work who could climb ramps and stairs occasionally, but never climb ladders, ropes or scaffolds; who would have to avoid all exposure to hazards defined as industrial machinery, unprotected heights and commercial driving until cleared by her physician and other similar things.  Who has the capacity for superficial contact with the general public and the ability to work in a static/low-stress environment where there is some contact with — I'm sorry, let me read that one again.  Who has the ability to work in a static/low-stress environment where contact with others is occasional and superficial.

(Tr. 66.)  The ALJ later clarified the term "superficial" meant "the contact would have to not be decision-making in nature, no negotiations or problem-solving."  (Tr. 68.)

The VE testified the hypothetical individual would not be able to perform Herbert's past work as an electrical light assembly worker, licensed practical nurse, machine operator, light

assembly worker, machine tender, plastics worker, or quality control supervisor, plastics.  (Tr. 66-67.)  The VE further explained, however, the hypothetical individual would be able to perform other representative jobs in the economy, such as packager (light, unskilled, SVP 2); bench assembler, small products (light, unskilled, SVP 2); and mail clerk (light, unskilled, SVP 2).  (Tr. 68-69.)

## III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial

22

gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Herbert was insured on her alleged disability onset date, April 2, 2012, and remained insured through December 31, 2017, her date last insured ("DLI.") (Tr. 19.) Therefore, in order to be entitled to POD and DIB, Herbert must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

23

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2.      The claimant has not engaged in substantial gainful activity since April 2, 2012, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.      The claimant has the following severe impairments: cerebrovascular accident, hypertension, major depressive disorder, and alcohol/substance abuse disorder (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally climb ramps and stairs but never climb ladders, ropes and scaffolds. She must avoid all exposure to hazards such as industrial machines, unprotected heights and commercial driving until cleared by her physician.  She has the ability to work in a static, low stress environment where contact with others is occasional and superficial where superficial means no problem solving, decision making or negotiation.  She also has the capacity for superficial contact with the general public.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on June ** 1966 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from April 2, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 19-30.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing

25

*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.

Ohio July 9, 2010).

## VI.  ANALYSIS

### *Listing 12.04*

In her first assignment of error, Herbert argues the ALJ erred in finding she did not meet or medically equal the requirements of Listing 12.04.  (Doc. No. 16 at 1, 14.)  She first argues that, in applying the "paragraph B" criteria of that Listing, the ALJ improperly concluded she had only a mild restriction in her daily living activities.  (*Id.* at 8-10.)  Citing extensively from her hearing testimony, Herbert maintains "the overall quality of her daily living activities is dismal," arguing "substantial evidence shows that [she] cannot do [these activities] in a consistent, useful, routine basis nor without supervision or direction nor without undue interruptions or distractions."  (*Id.* at 10.)  Herbert next argues the ALJ improperly concluded she had a "moderate" (as opposed to "marked") restriction in her social functioning, asserting the ALJ failed to acknowledge hearing testimony showing she "cannot interact with others on a sustained basis."  (*Id.* at 12.)  Finally, Herbert argues the ALJ improperly found she had a "moderate" (as opposed to "marked") restriction in concentration, persistence, and pace.  (*Id.* at 13.)  She maintains "there is no substantial evidence to suggest that [she] can perform tasks with sustained focused attention in the work setting."  (*Id.* at 14.)

The Commissioner argues substantial evidence supports the ALJ's finding Herbert did not meet or medically equal Listing 12.04.  (Doc. No. 17 at 7-13.)  She maintains the ALJ properly evaluated Herbert's daily activities, citing numerous references to the record indicating she reported an ability to maintain her personal care, care for pets, prepare meals, sweep, dust, do laundry, drive, shop, watch television, and read.  (*Id.* at 9.)  The Commissioner also notes Dr.

27

Zeck's consultative examination reports, as well as the opinions of Drs. Steiger and Haskins, support a finding Herbert had no more than moderate restrictions in social functioning and maintaining concentration, persistence and pace.  (*Id.* at 10.)  Finally, the Commissioner notes Herbert has presented no medical opinion indicating she had marked limitations in her activities of daily living, in maintaining social functioning, or in maintaining concentration, persistence, or pace.  (*Id.* at 11.)

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 Fed. Appx. 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a), 416.925(a).  Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3).  It is the claimant's burden to bring forth evidence to establish his impairments meet or are medically equivalent to a listed impairment.  *See e.g. Lett v. Colvin*, 2015 WL 853425 at * 15 (N.D. Ohio Feb. 26, 2015).  A claimant must satisfy all of the criteria to "meet" the listing.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885,

28

107 L.Ed.2d 967 (1990). A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414-15 (6th Cir. 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision. *Id.* at 416-17.

Here, the ALJ determined, at step two, that Herbert suffers from the severe impairments of cerebrovascular accident, hypertension, major depressive disorder, and alcohol/substance abuse disorder. (Tr. 21.) The ALJ then proceeded at step three to find Herbert did not meet or equal the requirements of a Listing, explaining (in relevant part) as follows:

> Although the claimant has 'severe' impairments, they do not meet the criteria of any listed impairments described in Appendix 1 of the Regulations (20 CFR, Subpart P, Appendix 1). No treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment of the Listing of Impairments. * * *
>
> The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.09. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of

extended duration, means three episodes within 1year, or an average of once every 4 months, each lasting for at least 2 weeks.

In activities of daily living, the claimant has mild restriction. The claimant indicates that she has no[] restrictions in her personal care, prepares simple meals and performs light household chores. She goes outside up to twice a day and goes shopping for groceries. She feeds and lets the dog out. (Exhibit 2E). She reports doing meal planning and preparation and doing laundry at a laundromat. She reported to the consultative examiner that she takes her husband to work and picks him up. (Exhibit 4F, Exhibit SF). The foregoing would suggest only mild restrictions in her
activities of daily living.

In social functioning, the claimant has moderate difficulties. The claimant reports that she does not socialize, has difficulty getting along with others and is afraid to leave the house (Exhibit 2E). She reports that she has friends, but that they are not very social and that she has generally lost interest in her hobbies. She does not belong to any clubs and does not attend church. (Exhibit 4F, Exhibit S F ). This would suggest moderate restrictions in the claimant's social functioning.

With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant reports memory deficits, poor concentration and an inability to pay attention for more than 20 minutes (Exhibit 2E). She tests in the average range of intelligence with nearly one standard deviation below the mean in her delayed memory (Exhibit 4F, Exhibit SF). Viewing the evidence in the light most favorable to the claimant, the undersigned finds her to be moderately restricted in her ability to maintain concentration, persistence and pace.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration. The record contains no indication that the claimant has suffered repeated episodes of decompensation of extended duration as those terms are used in the Regulations.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

(Tr. 22-23.)

As set forth *supra*, Herbert asserts the ALJ erred in finding she did not meet or equal the requirements of Listing 12.04. (Doc. No. 16.) Listing 12.04 ("affective disorders") contains the following criteria: (i) "paragraph A" criteria, impairment-related symptoms, (ii) "paragraph B"

30

criteria, impairment-related limitations, and (iii) "paragraph C" criteria, additional functional criteria.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00A, 12.03, 12.04, 12.06.  A claimant can meet the requirements of this Listing only if she satisfies either: (1) the criteria of both paragraphs

A and B; or (2) the criteria of paragraph C.  *See Bowman v. Comm'r of Soc. Sec*., 683 Fed. Appx. 367, 372 (6th Cir. 2017).  Here, Herbert argues, and the Commissioner does not disagree, that the ALJ found Herbert meets Listing 12.04's "paragraph A" criteria.  (Doc. No. 16 at 1, 7.)  Herbert does not argue she meets or equals the Listing's "paragraph C" criteria.  The Court will, therefore, focus exclusively on whether Herbert's impairments meet or equal the "paragraph B" criteria.

In order to satisfy the "paragraph B" criteria of the version of Listing 12.04[5] in effect at the time of the ALJ decision, Herbert must exhibit "marked" or "extreme" functional limitations in two or more of the following categories: (1) activities of daily living; (2) maintaining social functioning; and (3) maintaining concentration, persistence, or pace.[6]  *See Bowman,* 683 Fed. Appx. at 372; *Vecchio v. Comm'r of Soc. Sec.*, 2017 WL 2644129 at * 7 (N.D. Ohio April 28, 2017).  To establish a "marked" limitation in any of these areas, the claimant's impairment must "seriously interfere with the ability to function independently, appropriately, and effectively."

---

[5]  The Social Security Administration revised the medical criteria for evaluating mental disorders effective January 17, 2017.  *See* 81 FR 66138-01 (S.S.A. Sept. 26, 2016), 81 FR 66138-01, 2016 WL 5341732 at *1.  However, because the prior version was in effect at the time the ALJ rendered his opinion, the Court utilizes that version in its review of that determination.

[6]A claimant can also satisfy the "paragraph B" criteria by showing repeated episodes of decompensation, each of extended duration.  Hebert does not argue she satisfies this criteria.

31

*See Foster v. Bowen*, 853 F.2d 483, 491 (6th Cir. 1988); *Harvard v. Comm'r of Soc. Sec.*, 2015 WL 506976 at * 14 (N.D. Ohio Feb. 6, 2015).

The Court will discuss Herbert's arguments with respect to the above categories separately, below.

### *Activities of Daily Living*

Herbert first argues the ALJ erred in finding she was mildly restricted in the category of activities of daily living.  (Doc. No. 16 at 8-11.)  She maintains that, in finding she could prepare simple meals, perform household chores, shop, care for her dogs and drive her husband to work, the ALJ "way over-generalized and glossed over the details" of her testimony and statements. (*Id.* at 8.)  In particular, Herbert argues the ALJ failed to recognize her hearing testimony that she needs assistance or reminders from her husband to perform nearly all of the above activities.  (*Id.* at 8-9.)  She maintains the ALJ improperly "made it sound like Herbert can do the full range of caring for herself, preparing meals, doing household chores, and shopping for groceries on a regular and consistent basis."  (*Id.* at 9.)  Relying heavily on her and her husband's hearing testimony, Herbert argues the ALJ's findings on this issue are not supported by substantial evidence. (*Id.*)

Regarding activities of daily living, the regulations in effect at the time provided as follows:

> Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.

32

20 C.F.R. § Pt. 404, Subpt. P, App. 1 (2015), § 12.00.

The Court finds substantial evidence supports the ALJ's determination Herbert has less than marked restrictions in her activities of daily living.  As the ALJ correctly noted, Herbert reported her impairments did not effect her ability in the area of "personal care," i.e., her abilities to dress, bathe, care for her hair, or use the toilet.  (Tr. 191.)  The record also supports the ALJ's finding she could prepare simple meals and perform light household chores.  (Tr. 22.) Specifically, occupational therapy notes from August 2012 indicate Herbert reported she did the dishes and dusting, and could take care of simple meals.  (Tr. 308.)  In a March 2013 Function Report (cited by the ALJ as "Exhibit 2E"),  Herbert stated she could sweep the floor and dust "when needed," as well as feed her dogs and let them out.  (Tr. 191-192.)  Moreover, during both of her consultative examinations, Herbert reported to Dr. Zeck she does meal planning and meal preparation, drives her husband to and from work, and shops when necessary.  (Tr. 365, 372.) Dr. Zeck concluded Herbert "can generally do her [activities of daily living] on a day to day basis."  (*Id.*)  Additionally, and as the ALJ noted later in the decision, both Drs. Steiger and Haskins concluded Herbert had only mild limitations in her activities of daily living.  (Tr. 28, 77, 105.)

Herbert highlights hearing testimony indicating she is unable to perform household chores or cleaning, needs reminders to complete tasks, and her husband does nearly all of the housework on a regular basis.  (Tr. 45, 57, 61.)  The ALJ acknowledged this testimony later in the decision (Tr. 24) but accorded great weight to the consultative examiner's findings on this issue, as well as the opinions of Drs. Steiger and Haskins that Herbert is only mildly limited in her daily living activities.  It was not error for the ALJ to do so.  As noted earlier, the substantial

33

evidence standard presupposes "there is a zone of choice within which the [ALJ] may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). "This 'zone of choice' includes resolving conflicts in the evidence and deciding questions of credibility." *Postell v. Comm'r of Soc. Sec.*, 2018 WL 1477128 at * 10 (E.D. Mich. March 1, 2018) (citing *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987)).  Here, the ALJ's findings are within that "zone of choice" and thus supported by substantial evidence.  *See e.g., Vecchio*, 2017 WL 2644129 at * 8 (finding substantial evidence supports an ALJ's finding of less than marked limitations in daily living where the claimant was capable of loading the dishwasher, doing the laundry, and preparing simple meals); *Black v. Comm'r of Soc. Sec.*, 2015 WL 350573 at * 6 (S.D. Ohio Jan 26, 2015) (finding substantial evidence supports an ALJ's finding of less than marked limitations in daily living where the claimant could prepare simple meals, clean, do laundry, iron clothes, and independently take care of dressing and bathing).

Accordingly, the Court finds the ALJ did not err in finding Herbert had a less than marked limitation in the category of activities of daily living.

### *Social Functioning*

Herbert next argues the ALJ erred in finding she was moderately restricted in the category of social functioning.  (Doc. No. 16 at 11-13.)  She maintains the ALJ failed to acknowledge hearing testimony that Herbert stays in her room most of the day and isolates herself from friends and family.  (*Id*. at 12.)  Herbert asserts substantial evidence does not support the ALJ's conclusion she can interact with others on a sustained basis.  (*Id*.)

Regarding social functioning, the regulations in effect at the time provided as follows:

Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning

34

includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.

20 C.F.R. § Pt. 404, Subpt. P, App. 1(2015), § 12.00.

The Court finds substantial evidence supports the ALJ's determination Herbert has moderate restrictions in social functioning.  The ALJ expressly acknowledged Herbert's testimony she does not socialize, has difficulty getting along with others, and is afraid to leave the house.  (Tr. 22.)  However, there is also substantial evidence showing Herbert had a strong relationship with her family, particularly her husband.  (Tr. 362, 369.)  Moreover, the record reflects Herbert shopped occasionally and had no apparent problems interacting with store clerks and the general public while doing so.  In her Function Report, Herbert indicated she got along "well" with authority figures, including bosses.  (Tr. 196.)  During her consultative examinations, Dr. Zeck noted Herbert was cooperative and answered all questions directed to her, albeit briefly. (Tr. 363, 371.)  He assessed GAF scores of 55 and 60, indicating moderate difficulties in social or occupational functioning.  (Tr. 366-367, 373.)  Finally, as the ALJ noted later in the decision, both Drs. Steiger and Haskins concluded Herbert had only moderate limitations in her social functioning.  (Tr. 28, 78, 105.)  Herbert does not direct this Court's attention to any treating or examining physician opinion to the contrary.

Based on the above, the Court finds the ALJ's determination Herbert has a moderate

35

limitation in social functioning is supported by substantial evidence.  *See, e.g., Primmer v. Comm'r of Soc. Sec.,* 2015 WL 9474691 at * 2 (S.D. Ohio Dec. 29, 2015) (finding substantial evidence supported ALJ's determination of moderate limitations in social functioning where, although the claimant had difficulty around others and panic attacks, she was able to go to the store with her sister-in-law, attend doctor appointments on a regular basis, and talk with others on a daily basis, and was cooperative during mental status examinations); *Gonzalez v. Comm'r of Soc. Sec*., 2014 WL 3735249 at * 12 (E.D. Mich. July 29, 2014) (finding substantial evidence supported ALJ's determination of moderate limitations in social functioning where, although the claimant avoided interpersonal relationships and isolated herself, she was able to interact successfully with people when shopping and using public transportation and treatment records indicated she was consistently cooperative and polite).

### *Concentration, Persistence or Pace*

Finally, Herbert argues the ALJ erred in finding she was moderately restricted in the category of concentration, persistence, and pace.  (Doc. No. 16 at 13-14.)  She emphasizes hearing testimony indicating she cannot cook on the stove because she forgets about the food while it is cooking; she only does housework with reminders from her husband; and she stares at the dishes and does not know what to do.  (*Id*. at 14.)  Herbert argues she "cannot even perform simple basic housework" and "there is no substantial evidence to suggest that [she] can perform tasks with sustained focused attention in the work setting."  (*Id*.)

Regarding concentration, persistence, or pace, the regulations in effect at the time provided as follows:

> Concentration, persistence, or pace refers to the ability to sustain focused attention
> and concentration sufficiently long to permit the timely and appropriate completion

36

of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.

20 C.F.R. Pt. 404, Subpt. P, App. 1 (2015), § 12.00.

The Court finds substantial evidence supports the ALJ's determination Herbert has moderate restrictions in concentration, persistence, and pace.  The ALJ expressly acknowledged Herbert's testimony she has memory deficits, poor concentration, and an inability to pay attention for more than 20 minutes.  (Tr. 22.)  However, later in the decision, the ALJ noted Dr. Zeck's finding that, although Herbert reported memory loss and concentration deficits, she retained the ability to understand, remember, and carry out instructions, as well as perform simple and multi-step tasks.  (Tr. 25.)  Indeed, the record reflects Dr. Zeck found Herbert "did exceedingly well on items involving her memory and her comprehension was quite good with no deficits, thus she does have the ability to function in a useful manner to an employer."  (Tr. 367.) He also found "no difficulties with Herbert's attention and concentration during this evaluation," noting "[s]he worked very diligently, was persistent, and her pace was rather quick."  (*Id.*) Finally, both Drs. Steiger and Haskins concluded Herbert had no more than moderate limitations in concentration, persistence, and pace.  (Tr. 28, 78, 105.)  Herbert does not direct this Court's attention to any treating or examining physician opinion to the contrary.  Accordingly, the Court finds the ALJ's determination Herbert has a moderate limitation in concentration, persistence, and pace is supported by substantial evidence in the record.

In sum, "[b]ecause the ALJ reached [her] decision using correct legal standards and because those findings were supported by substantial evidence, the Court must affirm it, even if

37

reasonable minds could disagree on whether the individual was disabled or substantial evidence could also support a contrary result." *Postell*, 2018 WL 1477128 at * 10 (citing *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003)).  *See also Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) ("If substantial evidence supports the Commissioner's decision, this Court will defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.").  As noted *supra*, the substantial evidence standard presupposes "there is a zone of choice within which the [ALJ] may proceed without interference from the courts."  *Felisky*, 35 F.3d at 1035.  For all the reasons set forth above, the Court concludes the ALJ's findings herein are within that "zone of choice."

Accordingly, it is recommended the Court find the ALJ did not err in finding, at Step Three, that Herbert's impairments do not meet or equal the requirements of Listing 12.04.[7]

**RFC**

In her second assignment of error, Herbert argues the RFC is not supported by substantial evidence.  (Doc. No. 16 at 15.)  The entirety of Herbert's argument on this issue is as follows:

The only jobs the vocational expert could fathom Herbert to do involved long

---

[7] Herbert also notes that, "under the listings in effect at the time of the ALJ hearing, [she] did not meet the criteria of Listing 11.04 pertaining to vascular accident." (Doc. No. 16 at 15.)  She asserts, however, that effective January 17, 2017, the listing was revised to state that a claimant is disabled from a vascular insult to the brain if it results in marked limitations of physical and mental functions as elaborated in the listing.  (*Id.*)  Herbert acknowledges "since this new listing was not available to the ALJ at the hearing, [she] cannot argue that the ALJ's denial under Listing 11.04 was not backed by substantial evidence." (*Id.* at 15-16.)  She nonetheless asks this Court to remand so the ALJ may conduct an analysis under the new version of Listing 11.04(C).  (*Id.* at 16.)  Herbert's request is without merit.  She offers no legal authority for remanding an ALJ decision for evaluation of a listing that did not exist until after the ALJ issued her final decision.

38

periods of standing.  (Tr. 69.)  The evidence shows that Herbert cannot tolerate standing for periods of time long enough to fulfill an entire day at work.  (Tr. 55, 79, 91, 104, 107, 117, 120, 195, 366.)  The ALJ's conclusion regarding Herbert's residual functional capacity is not back[ed] by substantial evidence.

(*Id.*)

The Commissioner argues the RFC is supported by substantial evidence, noting "there is no medical opinion that she had any limitations in standing."  (Doc. No. 17 at 16.)  She asserts "the ALJ incorporated all physical limitations proposed by the medical professionals into the RFC" and "properly weighed Plaintiff's treatment for her allegedly disabling impairments."  (*Id.*)  In this regard, the Commissioner emphasizes Herbert's physical examinations consistently revealed normal gait and tandem walking, intact toe and heel walking, normal ranges of motion, full strength, and intact sensation and coordination.  (*Id.* at 18.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96-8p, 1996 WL 374184 (July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F.Supp.2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed. Appx. 140, 148 (3d Cir. 2010)

("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96–8p, 1996 WL 374184 at * 7 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her*, 203 F.3d at 391.

As noted above, the ALJ determined, at step two, that Herbert suffered from the severe impairments of cerebrovascular accident, hypertension, major depressive disorder, and alcohol/substance abuse disorder. (Tr. 21.) After determining Herbert's impairments did not meet or equal the requirements of a listing at step three, the ALJ proceeded to consider Herbert's testimony and the medical and opinion evidence regarding Herbert's physical and mental impairments at step four. (Tr. 21-28.)

With regard to Herbert's physical impairments, the ALJ first acknowledged her testimony she has difficulty with lifting, standing, walking, climbing stairs, squatting and balancing. (Tr. 24.) She also noted Herbert's testimony she can only walk for 50 feet and must rest for half an hour before resuming. (*Id*.) The ALJ then discussed the medical evidence regarding Herbert's physical impairments. (Tr. 24-28.) She noted Herbert experienced a SAH and left wrist pseudoaneursym in April 2012, both of which were surgically repaired. (*Id*.) The ALJ stated Herbert was advised to follow up with rehabilitation services (including physical, occupational, and speech/language therapy) but failed to do so as of July 2012. (Tr. 24-25.) She

40

recounted treatment records indicating Herbert was evaluated for therapy in August 2012,

attended a few sessions, and was then discharged for failure to attend. (Tr. 25.) The ALJ also

discussed Herbert's course of treatment with Dr. Barker and Dr. Bej, as well as her ER visit in

January 2015. (Tr. 25, 27.) She noted physical examinations with both Drs. Barker and Bej were

normal, with no deficits in strength or sensation, no noted tenderness to palpation or spasms in

her paraspinal musculature, and normal gait and station. (Tr. 27.) Finally, the ALJ discussed

Herbert's January 2015 ER visit, noting the objective medical evidence was largely

unremarkable:

> A CT scan of her brain was unremarkable except from post-operative changes and a small right frontal scalp hematoma. A maxillofacial CT was negative except for some soft tissue swelling. A chest x-ray was normal. A CT of her cervical spine showed only mild degenerative changes at C5-6. An EKG showed normal sinus rhythm, ST/T wave and QRS interval. The claimant refused further treatment against medical advice as she had to meet her husband for lunch. (Exhibit 7F).

(*Id.*)

The ALJ then weighed the opinion evidence regarding Herbert's physical impairments

as follows:

> At initial determination and affirmed on reconsideration, the State agency medical consultants, based on a review of the record, also opined that the record supports a finding that the claimant retains the capacity to perform light work with only occasional ramps and stairs, but no ladders, ropes and scaffolds. She is also restricted to no hazards such as unprotected heights, machinery and commercial driving until cleared by her physician. In so finding, the state agency medical consultants note that while the claimant suffered a significant neurological insult secondary to a subarachnoid hemorrhage, physical examination since the claimant's discharge from have been essentially normal. However, these opined restrictions are intended to prevent an increase in intracranial pressure by avoiding potential hazards. (Exhibit 1A at page 5 to 10, Exhibit 2A at page 5 to 10, Exhibit 5A at page 6 to 11, Exhibit 6A at page 6 to 11). This opinion evidence has been accorded great weight as the undersigned is persuaded that an abundance of caution dictates a need for such precautions.

41

The undersigned notes that the record contains no medical source statements from the claimant's treating or examining physicians.

(Tr. 28.)  The ALJ formulated the following RFC: "After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work[8] as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally climb ramps and stairs but never climb ladders, ropes and scaffolds.  She must avoid all exposure to hazards such as industrial machines, unprotected heights and commercial driving until cleared by her physician."[9]  (Tr. 23.)

For the following reasons, the Court finds the physical limitations set forth in the RFC are supported by substantial evidence.  As the ALJ noted, treatment records consistently noted normal physical examination findings, including normal gait, normal motor activity, normal muscle tone and bulk, intact sensation, normal reflexes, normal coordination, and negative

---

[8]  "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."  20 CFR § 404.1567(b).  Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

[9]  In addition, the ALJ imposed the following mental limitations in the RFC: "She has the ability to work in a static, low stress environment where contact with others is occasional and superficial where superficial means no problem solving, decision making or negotiation.  She also has the capacity for superficial contact with the general public." (Tr. 23.)  In arguing the RFC is not supported by substantial evidence, Herbert limits her argument to the physical limitations set forth in the RFC and does not challenge the mental limitations assessed by the ALJ.

42

Romberg's.  (Tr. 238, 229, 339, 380, 377, 375, 385.)  In addition, Herbert's physicians noted no evidence of muscle spasm, trigger point tenderness on palpation, or difficulty performing toe, heel, or tandem walking.  (Tr. 380.)  Moreover, the only imaging of Herbert's spine identified by the parties (i.e., the January 2015 CT of her cervical spine) showed mild degenerative disc disease.  (Tr. 423.)  Finally, as the ALJ noted, both Drs. Bolz and Klyop opined Herbert could perform a reduced range of light work consistent with the ALJ's RFC.  (Tr. 79-81, 106-108.) Herbert directs this Court to no treating or examining physician opinion indicating additional physical functional limitations are warranted.

Accordingly, and for all the reasons set forth above, the Court finds the physical limitations set forth in the RFC are supported by substantial evidence.

***Credibility***

Lastly, Herbert argues remand is required because the ALJ improperly evaluated her credibility.  (Doc. No. 16 at 2, 15.)  Specifically, she maintains the ALJ is "not allowed to use Herbert's lack of treatment compliance or cooperation as a basis to find her not credible."  (*Id*. at 15.)  Rather, Herbert asserts, the ALJ "is supposed to consider Herbert's physical, mental and educational limitations as acceptable reasons why she failed to follow through with treatment." (*Id*.)

The Commissioner argues the ALJ did not err in evaluating Herbert's credibility.  (Doc. No. 17.)  She asserts that, in weighing Herbert's subjective allegations, the ALJ properly weighed the medical opinions in the record, objective physical and mental status examination findings in the treatment notes, and Herbert's treatment course and history.  (*Id.*)  The Commissioner further maintains the ALJ did not err in considering Herbert's non-compliance

with treatment.  (*Id*. at 17.)

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  *See e.g, Massey v. Comm'r of Soc. Sec*., 2011 WL 383254 at * 3 (6th Cir. Feb. 7, 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. § 404.1529(c)(1).  *See also* SSR 96–7p, 1996 WL 374186 (July 2, 1996).[10]  Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition; and, if so, (2) whether the objective medical evidence confirms the alleged severity of pain arising from the condition or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 853 (6th Cir. 1986).  *See also Felisky*, 35 F.3d at 1038–39; *Pasco v. Comm'r of Soc. Sec*., 137 Fed. Appx. 828, 834 (6th Cir. June 23, 2005).

If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record.  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See*

---

[10]  SSR 16-3p, 2016 WL 1119029 (SSA March 16, 2016) supercedes SSR 96-7p, 1996 WL 374186 (SSA July 2, 1996), which was in effect at the time of the February 11, 2015 hearing.  Here, the parties do not dispute that SSR 96-7p governs the instant action. (Doc. No. 16 at fn 1).

*Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers*, 486 F.3d

at 248 ("noting that "credibility determinations regarding subjective complaints rest with the

ALJ").  The ALJ's credibility findings are entitled to considerable deference and should not be

discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir.

1987).  Nonetheless, "[t]he determination or decision must contain specific reasons for the

finding on credibility, supported by evidence in the case record, and must be sufficiently specific

to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave

to the individuals statements and the reason for the weight."  SSR 96–7p, Purpose Section, 1996

WL 374186 (July 2, 1996); *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's

testimony as incredible, he must clearly state his reason for doing so").[11]

      To determine credibility, the ALJ must look to medical evidence, statements by the

claimant, other information provided by medical sources, and any other relevant evidence on the

record.  *See* 20 C.F.R. §404.1529; SSR 96–7p, Purpose, 1996 WL 374186 (July 2, 1996).

Beyond medical evidence, there are seven factors that the ALJ should consider.[12]  The ALJ need

---

[11] SSR 16-3p similarly provides that an ALJ's "decision must contain specific reasons for the
weight given to the individual's symptoms ... and be clearly articulated so the
individual and any subsequent reviewer can assess how the adjudicator evaluated the
individual's symptoms." SSR 16-3p, 2016 WL 1119029 at *9.

[12] The seven factors are: (1) the individual's daily activities; (2) the location, duration,
frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate
the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the
individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other
than medication, the individual receives or has received for relief of pain or other
symptoms; (6) any measures other than treatment the individual uses or has used to
relieve pain or other symptoms; and (7) any other factors concerning the individual's
functional limitations and restrictions due to pain or other symptoms.  *See* SSR 96–7p,
Introduction and SSR 16-3p, 2016 WL 1119029 at * 7; *see also Cross v. Comm'r of Soc.
Sec.*, 373 F.Supp.2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified

not analyze all seven factors, but should show that he considered the relevant evidence.  *See Cross*, 373 F. Supp.2d at 733; *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Herbert's testimony she suffers from continuous pain, as well as memory, concentration, and attention deficits.  (Tr. 24.)  The ALJ determined Herbert's medically determinable impairments could reasonably be expected to cause her alleged symptoms; however, the ALJ found her statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely credible."  (Tr. 27.)  In this regard, the ALJ noted that, while Herbert complained of constant pain that prevented her from lifting, walking more than fifty feet, standing, and climbing stairs, Herbert's physicians consistently noted normal physical examination findings, including normal strength and sensation, normal gait, and no tenderness to palpation or spasms in her paraspinal musculature.  (*Id*.)  Moreover, the ALJ observed Herbert's allegations of memory and concentration deficits were inconsistent with Dr. Zeck's examination findings of average intelligence and no significant weakness in memory.  (Tr. 25.)

In addition, the ALJ noted frequent references in the record to Herbert's noncompliance with treatment, explaining as follows:

> The undersigned notes indications in the record suggesting significant non-compliance with recommended medical treatment.  Indeed, although she carries a diagnosis of hypertension, she was noted to be medically non-compliant with treatment prior to her cerebrovascular accident (Exhibit 1F at page 22).  Progress notes from the claimant's primary care physician indicate that she was prescribed Lozol on February 5, 2013 secondary to elevated blood pressure.  On follow up March 5, 2013, the claimant is noted to be non-compliant with recommendations to exercise and follow a low salt diet.  (Exhibit 3F at page 5).   In addition, she

statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

underwent acute rehabilitation just after surgery to repair her ruptured aneurysm, but follow up notes indicate that she failed to continue outpatient PT, OT, and SLP services after discharge (Exhibit 1F at page 7). When the claimant did start therapy, she was ultimately discharged after only two (2) sessions on September 11, 2012 for non-compliance after failing to attend scheduled sessions three (3) times or returning calls from her therapist (Exhibit 2F at page 18, 22). In addition, the claimant reports having an indefinite suspension of her license, yet drove to the consultative examinations on both occasions (Exhibit 4F, Exhibit 5F). To the extent that these inconsistencies reflect negatively on the claimant's credibility, only partial credibility can be accorded the claimant.

(Tr. 27-28.)

Reviewing the decision as a whole, the Court finds substantial evidence supports the ALJ's credibility determination. As the ALJ correctly noted, numerous treatment records (including those of Dr. Barker and Dr. Bej) reflected normal physical examination findings, including normal gait, normal motor activity, normal muscle tone and bulk, intact sensation, normal reflexes, normal coordination, negative Romberg's, as well as no evidence of muscle spasm, trigger point tenderness on palpation, or difficulty performing toe, heel, or tandem walking . (Tr. 238, 229, 339, 380, 377, 375, 381, 385.) Moreover, as discussed above, the January 2015 CT scan of Herbert's cervical spine showed only mild degenerative changes. (Tr. 423.) Indeed, Herbert points to no objective physical examination findings or imaging results that are consistent with her testimony of severe physical limitations in lifting, standing, and walking.

Likewise, with regard to her mental impairments, the ALJ correctly noted that Herbert's allegations of disabling memory, concentration and attention deficits were inconsistent with Dr. Zeck's consultative examination findings. As discussed *supra*, the record reflects Dr. Zeck found Herbert "did exceedingly well on items involving her memory and her comprehension was quite good with no deficits, thus she does have the ability to function in a useful manner to an

47

employer."  (Tr. 367.)  He also found "no difficulties with Herbert's attention and concentration

during this evaluation," noting "[s]he worked very diligently, was persistent, and her pace was

rather quick."  (*Id*.)  Finally, both Drs. Steiger and Haskins concluded Herbert had no more than

moderate limitations in concentration, persistence, and pace.  (Tr. 28, 78, 105.)  Herbert does not

direct this Court's attention to any treating or examining physician opinion to the contrary.

 Nonetheless, Herbert asserts remand is required because the ALJ improperly focused on

her non-compliance with prescribed treatment, including physical, occupational, and

speech/language therapy.  The Court disagrees.  An ALJ properly considers a claimant's

non-compliance with treatment when assessing the claimant's limitations and credibility.  *See* 20

C.F.R. § 416.930(b) ("if you do not follow the prescribed treatment without a good reason, we

will not find you disabled"); 20 C.F.R. § 416.929(c)(3)(iv, v)(in considering the severity and

limiting effects of an impairment, an ALJ may consider the effectiveness of medication the

claimant has taken and treatment she received).  *See also Hawley v. Comm'r of Soc. Sec.,* 2016

WL 8671206 at * 6 (E.D. Mich. July 22, 2016) ("An ALJ may consider a claimant's failure to

comply with treatment as a sufficient reason to discount credibility."); *Beadle v. Comm'r of Soc.

Sec.*, 2016 WL 7335808 at * 9 (N.D. Ohio Nov. 3, 2016) (same); *Soto v. Comm'r of Soc. Sec.*,

2014 WL 1576867 at * 8 (N.D. Ohio April 18, 2014) ("Non-compliance is an appropriate ground

for adversely assessing a claimant's credibility."); *Angelo v. Comm'r of Soc. Sec.*, 2013 WL

765646 at *7 (S.D. Ohio Feb.28, 2013), *adopted by* 2013 WL 1344841 (S.D. Ohio Apr.2, 2013));

*Tyrpak v. Astrue*, 858 F.Supp.2d 872, 880 (N.D. Ohio 2012) ("[I]t is reasonable to expect that a

claimant who is suffering from disabling pain will seek examination or treatment and the ALJ

can doubt his credibility for a failure to do so.")

Herbert emphasizes that SSR 96–7p provides "an adjudicator must not draw inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."  SSR 96–7p, 1996 WL 374186 at * 7.  Herbert does not, however, direct this Court's attention to any evidence she provided an explanation to the ALJ for her failure to follow her treating providers' prescribed treatment, nor does she identify any other information in the case record that she believes might have explained her failure to follow through with prescribed medical treatment.

Nonetheless, even if the ALJ erred in her consideration of Herbert's non-compliance, a review of the decision makes clear she did not solely rely on evidence of non-compliance in evaluating Herbert's credibility.  To the contrary, and as noted above, the ALJ also considered numerous other factors, including Herbert's normal physical examination findings, the range and scope of her activities of daily living, and the medical opinion evidence.  In sum, consistent with SSR 96-7p, the ALJ properly considered the entire record and found Herbert's allegations were not fully credible.  Under these circumstances, remand is not required.  *See Johnson v. Comm'r of Soc. Sec.*, 535 Fed. Appx. 498, 507 (6th Cir. 2013) ("[E]ven if an ALJ's adverse credibility determination is based partially on invalid reasons, harmless error analysis applies to the determination, and the ALJ's decision will be upheld as long as substantial evidence remains to support it.") (citing  *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir.2012)).

Accordingly, the Court finds this argument is without merit.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends the Commissioner's final decision be AFFIRMED.

$\qquad$ s/Jonathan D. Greenberg $\qquad$
Jonathan D. Greenberg
United States Magistrate Judge

Date: May 1, 2018

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**